The second case of the morning is called 209-151, J. Norman Young v. Sharon Holmes, Sheila Larson, and Tom Corcoran. On behalf of the Appellant, Mr. Craig Cobine. On behalf of the Appellee, Alexander Terris. Good morning, Counselor. Good morning, Your Honor. An unlimited power to tax involves necessarily a power to destroy, because there is a limit beyond which no institution and no property can bear taxation. This was the argument of Daniel Webster in McCulloch v. Maryland, and this case is a tragic example of the truth of that argument. This property purchased in October of 2004 for a price for these 100 acres for $2 million. 17 months later, in March of 2006, is taxed by the town of Cortland under a special tax in District No. 4 for a tax in excess of $4 million. This tax is confiscatory, and we ask this Court to rule that it is unconstitutional, because it is not an ad valorem tax. Under Article 9, Section 4A of the Illinois Constitution, taxes upon real property shall be levied uniformly by evaluation. Let me just interrupt for a second here. If it was adjusted to be an ad valorem tax, the ultimate number wouldn't change, right? It would just be proportioned differently among the property owners? Not necessarily, because you would then have the assessed value that would make differences. I guess what I'm asking you is, are you suggesting it's unconstitutional because the amount doesn't correlate to the actual cost of providing these water and sewer services? I was assuming that the cost of providing water and sewers there is, whatever you said, $4 million. And if that's the cost, it's a question of whether it's paid proportionally to the value of the property or uniformly regardless of the property. That is not necessarily the cost of anything. That is a calculated amount based on an $8,500 sewer water connection fee times an expected number of connections that may or may not occur. I guess what I'm trying to ask you about your constitutional issue is that they can't charge $8,500 if it's not at all in relation to what the real cost is. The constitutional argument is that they cannot tax by levying a direct amount against a property. They are to levy an amount against a number of properties, and the proportion of taxation between those properties is then based on the assessed value of the property. In this case, there is no assessed valuation. It never comes into the factor. No, that part I understand. And there is just a direct levy of tax. I'm just trying to figure out whether or not you're making some argument that this is confiscatory because the town of, what is it, Cortland? Yes. Is not really charging, no matter who pays what percentage of the bill, are you saying that the bill itself is outrageously high? It is outrageously high. Let me finish this. If it was taxed ad valorem, would it still be outrageously high? It would probably have to be, yes. But because of the assessed values of the property, it would be completely skewed differently, and this property, we believe, would be taxed considerably less than it is now. Are you telling me it's possible to provide sewer and water to this property for a much cheaper price? Is anything developed like that in the record? Is that an issue? It would be an issue if we ever got to trial, but we never had an opportunity to address the benefit issues which were comp two in our complaint. Okay, go ahead. The establishing ordinance that we have argued already that it is unconstitutional because it does not make an ad valorem tax, we believe is also invalid because it does not set forth the amount of the tax which is required by the statute. Again, the formula is set forth in the ordinance, and it says that it's $8,500 for each expected unit, and the ordinance refers to the number of units. It says look to the annexation agreement for the property, and this property has no annexation agreement. It says look to what is on Appendix A-2, and Appendix A-2 is blank and does not have any units for any of the properties thereof. What that means is that you cannot tell from within the ordinance how many units are supposed to be on the property, and this ordinance is the only place that that is set. Now, the argument that's made by the defendants is that there is a zoning ordinance that granted a preliminary PUD plan that says how many units there are. Unfortunately, that ordinance is not in the court record, but even that ordinance had provision in it that said but only to the number of units for which you accept the spray responsibility. This sewer treatment system is not a plant like most sewer plants are that accepts the effluent, treats it, and then releases it to a stream. The deal here is that after the sewage is treated at the plant, they pump it back to the property that sent it initially, and you have to get rid of the effluent. You have to spray it somewhere, and in this case, they expect a certain amount of property to be set aside somewhere by the developers under these annexation agreements to get rid of the effluent. Now, the plan that was approved for this property did not set aside any land for spray, but the ordinance said you'd have to come up with some land somewhere. Subsequent to that, in the summer of 2005, approximately six months before the town adopted this special taxing district, the town passed an ordinance accepting a dedication of a spray easement that took up a considerable portion of this property. We've never had the opportunity to develop a testimony to exactly say how many units are taken up, but it looks like approximately 25 to 30 percent of the property that was going to be units is covered by this easement that the city declared and which the plaintiffs never signed or knew about. Subsequently, just before the adoption of this ordinance, the city entered into or the town entered into a special service agreement with Eagle Homes, who was a contract purchaser of the property, and in that, the number of units that were to be attached was stated as the number included in the plan, but only to the extent that you have set forth the area for spray. So we have never had the opportunity, because our complaint was dismissed, to go into court and to contest or determine, first off, how many units the city thinks we're supposed to have and to contest that number because of this potential for spray. But nevertheless, we are being taxed and have so far received two tax bills for two years based on whatever the number is that the city has determined. Now, the difficulty here is that this ordinance has no mechanism for correction. The ordinance has a mandatory prepayment provision that says once we say you have those units, you have those units, and if anything occurs to reduce the number of units, you have to pay $8,500 per reduced unit immediately. It's an accelerated payment to get rid of the units, and so where the failure of this ordinance to set forth the number, it doesn't meet the statutory requirement to do that, but it also doesn't even tell us what the number is. We can guess what it is, but if we ever change that number, the penalty is that we have to pay it immediately. We don't even get to pay it over the term of the special service district, and we believe that the plaintiff here should have the opportunity in court to contest this situation where we are being taxed for units and have to pay for units even if we don't bill them. Now, our primary concern here is with the constitutionality and this unique issue of taxing that is not on the law. There is nothing in the debates of the Constitutional Convention of 1970 that gives any indication that there was any intent to change from the historic procedure in this state, which has been and has always been since the first Illinois Constitution, to require odd valorem taxes. And we have quoted in our brief the one comment on that by Mr. Carnes, later Justice Carnes, that it was the intent to keep taxation odd valorem in the state of Illinois. We have this one statute, which is one paragraph out of three paragraphs. The first paragraph provides the odd valorem tax, which all of the plaintiff cases, except for the Will County case, have followed in levying special service taxes. They've all been odd valorem taxes. This is the first case to ever challenge a case that is not odd valorem. The Will County case that came before the third district was a situation where there was a front footage allocation of amounts, and the court in that case said, well, this really looks like a special assessment and refused to order the county to put it on the tax bill. They did not deal with any constitutional questions, and there was no taxpayer who was even a party to that case. This is completely different. We are the taxpayer, and we have raised the issue that taxation in Illinois should be and can be only based on the value of the property and not on any other basis. We have also raised some other issues relating, for instance, to notice. There was a notice sent by certified mail under a statute that requires only regular mail. And when that certified mail receipt came back showing non-delivery, nothing was done. And we have argued that when someone intentionally takes on doing more than the statute requires, sending by certified rather than regular mail, that one also takes on the burden of receiving notice, then your mailing was not successful. So you're saying even though they went over the minimum requirement, they're held to that higher standard? Yes, because they also held the recipient to a higher standard. If you mail something to somebody, the postman just shoves it in a box or a slot. If you mail it by certified mail, the postman doesn't leave it unless you sign for it. So you have to be there, or you've got to go pick it up. You've got to do something. And so they raised the standard both for the recipient and they raised, we believe, the standard for themselves, that they have the knowledge of non-receipt. Do you have any case law with respect to that understanding? We have suggested only the Flowers case. This is a case of first impression as well, but we think that it is one that is worth considering, even though in this case the receipt came back after the public hearing, which was the alleged reason for not following the usual procedure that they had to send another notice. But that was done because the public notice was over. What's the difference? It ignores that that very notice also notified the person that they had a right to petition to defeat the special service area for a period of time after the public hearing. If we assume that you're correct and that there was not appropriate notice, what's the remedy? The remedy is that this property would not be taxed under the special service district. At all? Or are they entitled to a new hearing? Again, the remedy would be that they would not be included because they had not received the notice and not had their opportunity. And just the Youngs? Good. The situation also is that we have asked that this court consider that the case be returned to the trial court because of Justice Brady or Jeff Brady, who did not disqualify himself, although he had been the common attorney. Within seven years of the case coming before him. Why did you raise that at somewhat the 11th hour? Excuse me? Why didn't you raise that issue earlier with the judge? The issue was raised with the judge in May. Not exactly. I mean, looking at the transcript, I don't recall anywhere where anybody said, hey, judge, this is a mandatory rule. It's seven years. It's pretty clear cut. On June the 5th, Mr. Coughlin made that exact statement to the judge. That was after the hearing, though. Yes. At the main date, it was Mr. Coughlin who raised the issue and said, judge, weren't you the town attorney? And the judge responded, yes, I was the town attorney, but I'm not going to disqualify myself just because the town is a party here. It's a small town and everybody represents everybody eventually. And it's that that we maintain was the error in this case, that Judge Brady should have said, I was the town attorney. It was less than seven years ago that I was the town attorney. I'm disqualified. Now, you folks can go decide if you want to have a reminder of that disqualification. He instead said, I'm not disqualifying myself. Did somebody ask him? Did they make a motion for him to recuse himself? Or was it just this discussion? No, no. It was brought up to him. He said he was not. And then he proceeded. Then on a later date, after it ruled on a motion, it came up on a later date. It ruled on the substantive motion. Yes, he ruled on the dismissal of the original complaint that Mr. Coughlin brought it up and said, judge, I want to check that rule. And it's an absolute disqualification. And the judge was very upset with him and said, well, it's a fine time to bring it up. Why didn't you? And, you know, you should have made a motion and you waived it. And there was an argument about whether anybody had waived anything. And again, the critical date was May 22nd. There is no place in Rule 63 for a motion by the parties. It's the judge's burden to do what he's going to do. And in this case, unfortunately, the judge said, I'm not going to follow the rules. In other words, I'm not going to disqualify myself just because the town was my client. Is your position that once the judge says, OK, I've heard what you said, I'm not going to recuse myself, that that's it, that to pursue it further is pointless? Yes. So there's no concept of waiver to your mind? Again, not on the 22nd. It does not appear that anybody waived it. On the 5th, the judge is arguing with Mr. Coughlin that there was a waiver. At that point, Mr. Coughlin, who was the first attorney for Mr. Young, at that point said, Judge, we're not filing a motion on this. We leave it to the judge's decision on this issue and we're ready to proceed. Why didn't somebody file a motion for cause? Because, as you said, the lawyers don't have an opportunity under the canon of ethics to file a motion to recuse. Your understanding is that's the judge's bailiwick. But then don't you have other remedies? I don't know. You don't? No. I don't think there is no case. You can't file a motion for cause? I suppose you can always file a motion, but there is no motion in the rules that tells the judge he's wrong. But yes, I suppose they could have filed a motion. Let's back up and say, for instance, that you never made that motion under the canon under 63 saying, gee, judge, you really ought to recuse yourself. Wouldn't you be able to just go in and file a motion for substitution of judge based upon this judge not having the ability to be fair and impartial? Don't you always have that ability? I suppose you do. How much time between when you were up and I anticipate that you were originally assigned to Judge Klein? The case was originally assigned to Judge Klein, yes. Now, it's up for some type of hearing. It was up for hearing on a motion to dismiss. Right. Now, was that sent before Judge Klein? It came before Judge Klein and then he sent it to me.  I believe so, Your Honor. I was not the attorney there, but from the record as I read it, it appears that they came to see Judge Klein and Judge Klein sent it to Judge Klein. He's busy and he says, okay, I'm going to send it down the hall. Yes. So, as you're walking down the hall, that's your notice that you're going to the other judge? I believe that's the situation. Okay, thank you. Counsel for the appellee. May it please the Court, although the appellant began rather dramatically, in fact, I think this is a very ordinary case that is perhaps filled with a number of red herrings. On the notice issue, it's perfectly clear that no such tax could ever be assessed if the municipality were required to hunt down every property owner. Some special service areas may involve 50 property owners, others may involve 50,000. A certain number of letters . . . Isn't that why the statute allows you to just send it regular mail? Precisely. But you didn't do that. The statute says send it in U.S. mail. It does not say send it in regular mail. So, if the legislature had wished to provide that only a 42-cent letter would do the trick, it might have done so. In fact, certified mail is a superior form of notice. One could equally well argue that people are eager to receive and read certified letters and throw regular mail in the garbage. Who knows? But the statute simply says by depositing the U.S. mail. That was sufficient. And had it come by regular mail, a certain number of letters would always come back, no forwarding address moved. And to suggest that a taxing body would then have to hunt down every single property owner would paralyze the process. Well, you certainly have a much smaller list of people you'd have to hunt down than it would only be those whose certified mail came back. Yes, if certified mail were required. Right, but you opted for it. Correct. And maybe you had 1,000 people to notify, but only 10 came back. That's hardly as burdensome as hunting down, as you said, 1,000 homeowners. No, but had we mailed 100 non-certified letters and 10 came back as showing no forwarding address, would the municipality have the need of hunting those down, no more so? The obligation to cause the functioning of this process of government is to mail it. Representative government gives the public a certain amount of notice. You can go to the legislature and listen to their hearings and their deliberations. Here, you're entitled to more than ordinary notice. You get a mailing because you are determined by this legislature to be somewhat more affected by the proceedings of that body than the public at large. There are other governmental functions. Jones v. Flowers deals with a statute that precisely requires certified mail and where a property right, a tax sale, deprives a certain taxpayer of actual property. And there it might well be, it's certainly the law of the land, since that's the United States Supreme Court, that the government may not sit on a return notice and thereby deprive the taxpayer of an individual right to due process. That's not the case here. This is an ordinary governmental function. And therefore, to the extent there's a discussion as to whether the whole package came back or just the green card unsigned, it's an evidentiary matter that really is not germane to the decision because the facts in this case are really not disputed. In this case, therefore, I think it's appropriate to hear on a motion to dismiss, because although there were a great many proceedings in the trial court, no factual dispute, no dispute about the authenticity of any document ever arose. So the trial court was confronted with an undisputed record and now had to determine whether any cause of action was stated by the last complaint filed by Dr. Young. So I think the notice issue is much litigated, but the decision of the trial court was the notice was sent, that was sufficient. Once you reach that conclusion, all the argument in the briefs about the consent, while attractive, again, are somewhat of a red herring because no consent was required. Such taxes may be imposed by proper proceedings of the tax body without consent. The fact that the construction imposed by Dr. Young is somewhat fantastic in the sense that he was clearly a direct beneficiary and consenting party to these taxes is, I suppose, adds a certain moral dimension to this dispute, but it really doesn't reach the issue of whether or not the establishment ordinance was valid. However, the consent, Dr. Young's receipt of the offering memorandum, the fact that Dr. Young purchased some of these bonds, simply indicate the undisputed factual record that allowed the trial court to make the ruling that it did. The constitutional argument, again, in order for this court to find that the Youngs ought to be relieved of the burden of these taxes on constitutional grounds, requires this court to declare the special service area tax statute unconstitutional, at least in one aspect, because it clearly provides for the assessment of taxes in lieu of ad valorem taxes. So to the extent that that conclusion, it could be narrow, but it nevertheless requires that a statute that has under which billions of dollars of bonds have been issued in this state be declared unconstitutional. I think that the court must meet not only the standards, the high standards for determining the statute is unconstitutional, but the public policy implications of any declaration by an appellate court that essentially a bond issue is ultra vires because a special revenue bond is paid from only that source. So a declaration of the unconstitutionality of the taxing statute is tantamount to declaring a public bond ultra vires. Something that hasn't happened in the United States since 1906, and I think would create significant turmoil in the bond markets, at least for the state of Illinois. So that decision is never to be made lightly. But at the same time, I think the two articles of the Illinois Constitution are easily reconcilable, and in fact, an examination of this bond, of this special service area tax, shows that the method of valuation was precisely rational. Was precisely what? Very rational. Far more rational than any basis that would be ad valorem. To the extent that you're building sidewalks, assessing by the front foot is perfectly rational. To the extent that you are turning farmland into high density residential areas. But they hadn't done so at that point, correct? No, because you can't develop until you have water and sewer. You couldn't have water and sewer until a new sewage treatment plant was built. So the developers said, well, we'll build you one. So aren't you being speculative as to how they were being taxed at that point? Not at all. So you think that taxing dollar amount was premature? No, because every developer that participated knew precisely what the number of residential units on its particular property was going to be. There's a lot of argument about whether the Huns knew it, but the briefs make it clear. We all know what it is. It was 525. And then after the first 50 or 500 acres was redeemed by Eagle Homes, it was 430. Because that property had already been annexed, so there was no annexation agreement. And yet, of course, the development plan ordinance had been in place in public record long before this enactment. So there is, in fact, no substantial injustice because everybody knew. It's 525. It's now 430. And indeed, there was an anticipation that the final plan development would reduce the number of lots. As in any give and take between a municipality and developers. And yet, in order to borrow this money, to get the public, the Oppenheimer Bond Fund, to buy these bonds, there had to be a mechanism by which the number of lots could be changed in order to meet the public policy needs of the town, for parkland or for how the place might be arranged. But yet, the money had already been borrowed to build the sewage treatment plant, so it had to be repaid. The choice, I suppose, would have been to reassess the remaining lots or to require a prepayment. Requiring a prepayment was perfectly rational. Now, this is a matter of negotiation. To the extent that Dr. Young has a dispute with the town of Portman, that he is now irrationally depriving him of the ability to develop 430 lots and wishes to let him only develop 396, that is a lawsuit. But it's not a lawsuit involving the validity of the tax or the constitutionality of the statute or the establishing ordinance. It's a separate dispute with a limited government that suggests that its actions are arbitrary, capricious, or whatever else. That is an entirely different case than the case before this Court today. Can you address the recusal issue? Yes, I think that the trial court record is somewhat incomplete. As the Court may be aware, I mean, it's a recorded record, not ever been purpose-picked up. And it is true that Judge Klein reassigned this case to Judge Grady, and I was there. Attorney Coburn was not. And we did all march down. There was a long discussion of this in recess. And the trial of Judge Grady, I think, was critically aware of the issue. He raised it on the first instance. What issue? That he had been town attorney. He raised it? Yes. So he said, I was a town attorney? Yes. He brought an outside counsel to the town. He was not, I think, a town attorney, but his law firm had represented the town. The town was his client. The town had been his client. You say that the initial mention of this was by the judge or was brought up by one of the attorneys? Brought up by the judge. I believe. You believe? I don't remember exactly, but yes. It certainly was raised on the 22nd of May. All right. And. There's a remarkable statement. And we continue handling the case. Whether the record shows it or not. There is no way to approach it in the public court. I recognize. Was that no one objected after the judge disclosed it. And the court then laid its rulings in June. And in fact, the transcript does show that a remarkable remark by Attorney Coburn, who represented all of the attorneys. Other plaintiffs in the similar but not consolidated case. Say, well, I'm moving to recuse you. Why? Well, I thought you'd rule in my favor. Now that you haven't, I want you off the case. He says that in record. But he doesn't say that at the May hearing. He says that in June. Correct. If the judge was aware that he represented the town. And we presume the judge knows the rules. Isn't there an error? Seven years is seven years is seven years. Correct. And the answer is that this court could conclude from that which is in the transcript regarding Mr. Coburn. That in fact, Mr. Coburn and Mr. Collins, the two attorneys. Agreed that the judge could go forward on the 22nd. But can you waive that? Can you waive that? I believe so, yes, with the consent of the parties can waive it. The court can. But if the court fully and appropriately discloses. You said something that troubles me a few minutes ago that you don't think this transcript is accurate. I'm not sure it's complete. The transcript of the May 22nd hearing. So you're I mean, you're I'm there. You've got the transcript and that's not exactly how you remember it. Although that which is recorded is correct. Whether it's inaccurate for omission or it's inaccurate. It's inaccurate for omission. That was just stated. Neither of you submitted a bystander's record to correct that? No, because I think this should turn on the fact that in this case. The previous counsel for Dr. Young unquestionably waived it on the 27th. On the next hearing day in June. That would be much more accurate than waiving it. Yes, but that I think is more than sufficient. Because. The point being made is you must take some action if the court is in error. All right. And Judge Brady was perfectly willing to recuse himself. And attorney Powell. What would you point to indicating, at least in the limited transcript that we have, that Judge Brady said he was willing to recuse himself? Because he asked in the June hearing whether or not. No, in the May hearing. Where did, can you point to anything that would indicate that the judge was willing to recuse himself? Because as I read it, although it's, now I'm troubled that it's not everything that was said. It appears the judge was pretty clear that he was not going to recuse himself. He didn't think it was a conflict. He didn't think it was a problem. He didn't have any recollection. He was going to hear the case. I think that's fair. I think it's fair that the court subsequently recognized the timing of his representation in the town. There were further disclosures made. That is correct. Let me say. Just so I'm clear, would that be in May or was that in June? At the subsequent hearing. In June. In June, yes. However, very little emotion had been ruled upon in both cases. In one case, it was granted with respect to Attorney Coghlan's clients and it was sent. The judge ruled in favor of Dr. Young on that same day. And sustained, denied our motion to dismiss the case based on consent. But then comes that which I think fits well with the O'Malley rule and much sooner, which is a waiver. Do you wish to join in this motion to recuse? No, I don't, Your Honor. We don't wish you to recuse yourself. That is a waiver. And that is an early waiver. And I think whatever preceded it, it may have been more prudent for the judge to step back and insist on a full waiver on record at the first hearing. If the judge didn't recuse himself like he didn't, was there another alternative for the attorneys to proceed by way of, for instance, a motion for substitution of judge? Certainly. And in fact, Mr. Coghlan did make a motion for recusal. A simple motion. And Attorney Coghlan, representing the Youngs and Dr. Young, simply didn't join in that motion. The judge certainly would have granted it had he joined in it. But he said no, we don't wish to join in the motion. Was the other case recused? Pardon? Did the judge recuse himself on the other case? No, because Attorney Coghlan eventually changed his mind on that and withdrew the motion as well. But that, of course, would have had to have been done by his client. Yes, and his client was certainly present. But again, nothing in the transcript indicates that the clients agreed to that waiver. In the transcript with respect to Dr. Young? In any transcript, either day, is there anything that makes it clear? No, because when an attorney says we, we do not join in that motion. He does not, as we say in our briefs, speak in the royal plural. He speaks because his client is in court. And in any event, two weeks have elapsed. It is clear that the rule provides that the attorney must consult with his client to obtain a known waiver in full discussion, which can occur while the attorney is standing before the court. Which can or cannot occur while he's standing before the court? Which cannot occur. The attorney cannot candidly say, shall we seek another judge while he's standing there looking at the judge. And that rule would require a recess on the first day. And a recess was taken in May for this purpose. So that principle at least was recognized by Judge Brady at that time. Then two weeks elapsed, which obviously gave Attorney Coghlan a long time to speak to Dr. Young about whether or not they wanted this judge or a different judge. And then the words, we waive. I don't think the judge is required to call the client to the stand, swear the client in and say, do you waive, even though your attorney has spoken on your behalf. Well, after that recess, prior to that recess, there had been twice that the judge indicated he was not going to recuse himself. Correct, in the May hearing. Yes, and my argument here is simply that, one, you could have taken other actions. You could have moved to recuse, sought a felon guilty. But you didn't do that. You did the opposite. You came to court the next time and said, no, absolutely, Judge, we don't want you to recuse yourself. We're not joining in that motion. We want you to go forward. That has to be sufficient. That is actively misleading the court by saying, we want you to go ahead, but if you don't rule in our favor, we'll be back here in the second district complaining about it. That is entirely different, perhaps, than simply saying nothing to the court, allowing the error to continue without attempting to correct it in the trial court, and then bringing it up in the trial court. But here, you actively say to the trial court, we have no objection to your proceeding in the presence of another party's motion to recuse in which we would like to join because the facts are the same. So. And that motion was denied. I think that motion in the other case was withdrawn. Okay. And again, I don't think the record in that case is before this court or in Jermaine. What happened is Attorney Collins at some point said what he said, and I take it as a complete waive. And I think that's the fairest reading of that transcript. But I think to some extent, one has to give the trial court the benefit of the doubt. That's how he understood it. Two-day hearing ensued, and a year's worth of litigation ensued, and the issue never came up again. I think the trial court was perfectly correct in assuming that that statement did constitute a waive of the record. Perhaps delay it two weeks too late. That might be a criticism that can be offered, but that's the only argument. So, what we have then is a very complete factual record. The ordinance, the basis for the ordinance, the entire private placement that we're at, which describes the bond issue, attaches the plats, the maps in excruciating detail. All of that is part of the undisputed record before the trial court. And it simply demonstrates that Dr. Young was a money lender or a land speculator. We say he was a money lender. He provided purchase fund financing to a developer under that which is truly a mortgage. That is his position. Now, this is not property held for any purpose other than high-density residential development. The numbers are not at all outrageous. If you think about 430 quarter-acre lots, 30,000 a lot, that's $12 million. A taxing amount of $3 million per sewer to make those lots high-density residential lots is not at all confiscatory. It's perfectly consistent with the business process that was involved. It's clear that Dr. Young wished to invest money, obtain a higher rate of return than he could in a bank, made a deal with Eagle Homes that Eagle Homes would buy the land back, pay all the taxes, and give him a nice return on his money. That went wrong, not because he wasn't given notice, but because in 2007 the housing bubble collapsed. I can't sell a lot today in Cortland. Okay, very sad economic event. The risk you take, because there is no free lunch, you want no certainty, you put your money in a CD and get 2%. You want 39% on your money, you take a risk. This case is exclusively the result of the fact that you can no longer develop and sell lots in Cortland at the moment. But the bond money came in and was spent. And the issue also is that all these defects were known, if they existed, were known to Dr. Young in 2006. The sewage treatment plant wasn't completed until 2007. So the bonds were sold to the public on the basis of his consent, on the basis of property owners, and everything was fine until Eagle Homes defuncted, because Eagle Homes could no longer develop the lots, because no one was buying small houses in Cortland at this moment. So the concept of a trial court or a public court relieving any property owners, but especially one whose business interests are vitally aligned with the bond issue, as those business interests were perceived at the time, from his obligations, and stick instead a group of public bondholders. And the bonds are bought by bond funds, which are owned by all of us, and each shareholder in these bond funds may lose only $50, but that's not the point. The bondholders certainly relied on what was being done here, and they appropriately did so. So this is really a shifting of an unfortunate economic event. The housing money burst. Should this money lender, land speculator, pay for it? He took the risk to get a high return. Should the bondholders, my clients, pay for it? Or should bond counsel pay for it? Because bond counsel made no mistake of what I've been saying. Let's make sure that bond counsel pays for it. No, the economic burden appropriately lies on the party that took the risk and lost. And there is simply nothing here that justifies undoing that which was done, I think, perfectly properly, but certainly within the standard of substantial justice of the lender. All right, counsel, thank you very much for your argument. And will you rebuttal now? Counsel, go ahead. I would like to say that Dr. Young and his wife, Nadine Young, were buyers and sellers of real estate. They were not lenders. They bought the property. They did not buy the property from Eagle Homes. They bought the property instead of Eagle Homes buying it and then contracted to resell it to Eagle Homes. But Eagle Homes had never been a prior owner. They were a prior contract purchaser. What we have here is a situation where the town ignored the Youngs. The town dealt with the developer throughout the discussions. The town even entered into the 2006 Special Service Area Agreement in March with the developer. Are you saying that the Youngs had not yet sold the homes or sold the lots to the developers? The Youngs had originally purchased 150 acres of property in October of 2004. In March of 2005, 51 acres were purchased by Eagle Homes. And the Youngs have continued and still continue to own the remaining 100. And it is the 100 acres that is before the court now. That 100 acres was under contract to Eagle, but Eagle never owned it, never closed on it, never bought it. The town, who had had their original zoning with Eagle Homes as a contract purchaser, first was from the Fenstermachers and later contract purchaser of the Youngs, they dealt with that person exclusively. And as I was saying, in March of 2006, just before they did the Special Service Area, they forced the developer, Eagle Homes, to give up a 2003 agreement that was far more beneficial to him and forced him to go into this Special Service Area floor. And they signed an agreement with him that on its face purported to affect the whole 150 acres and referred to Eagle as the owner. The town also left it to Eagle to get Dr. Young's signatures to the extent that they thought he existed. And as such, all of the other property owners, all of the other properties, were subject to annexation agreements that set up this whole system and this whole function. And so everybody else was in on the deal. Dr. Young was not. Because he was a separate owner and the town chose to deal with Eagle and to sign their agreement, such as it is for this property, with Eagle only and not even get the signature of concurrence of the property owner. So when they got a mail, a thing back from the post office that his certified mail didn't go forward, it wasn't important. Stick it in the file. When they found out that their signature on their consent agreement wasn't, it was just a fax, they first sent a letter to Eagle saying, why don't you give us a new signature? When that didn't happen, they sent a blank page, one page, to Dr. Young. Don't identify the document. Don't tell him what it's for. It doesn't even mention Special Service Area 4. It mentions bonds and asks for his signature on a signature page. Because everyone just treated Dr. Young as if he didn't exist or barely existed. And they truly treated Nadine like she didn't exist. They didn't even request her signature or consent on anything. And so we ask this court, first of all, to rule that this tax, and this tax is Special Service Area 4, is unconstitutional because it is not a non-voluntary tax. We have not asked that the statute be declared unconstitutional. The statute does not render the tax. The statute merely sets up one of three potential ways to lend you a Special Service Area tax. In and of itself, it doesn't impose anything. So it is Special Service Area 4, and only as to the Youngs, that we ask this court to find that the tax is unconstitutional. Thank you. Thank you both for your arguments.